Pages 1 - 55

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | |
|---|---|
| AVAGO TECHNOLOGIES GENERAL IP (SINGAPORE) PTE.LTD.,<br><br>            Plaintiff,<br><br>  VS.<br><br>ASUSTEK COMPUTER, INC. and ASUS COMPUTER INTERNATIONAL,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>) NO. C 16-0451 EMC<br>)<br>)<br>)<br>)  San Francisco, California<br>)  Monday<br>)  April 18, 2016<br>)  10:00 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:          KILPATRICK TOWNSEND AND STOCKTON, LLP
                    1400 Wewatta Street
                    Suite 600
                    Denver, Colorado 80202
                 BY:  **DAVID E. SIPIORA, ESQ.**
                    **JEFFREY MATTHEW CONNOR, ESQ.**

**For Defendants:**          ALSTON & BIRD LLP
                    2828 N. Harwood Street
                    Suite 1800
                    Dallas, Texas 75201
                 BY:  **MICHAEL LEE, ESQ.**
                    **DEREK SCOTT NEILSON, ESQ.**
                    **MICHAEL JOHN NEWTON, ESQ.**

*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
            *Official Reporter - US District Court*
            *Computerized Transcription By Eclipse*

<b>P R O C E E D I N G S</b>

**MONDAY, APRIL 18, 2015**                                    **10:21 A.M.**

THE CLERK:  Calling Case C16-0451, Avago versus ASUSTeck.

Counsel, please come to the podium and state your name for the record.

MR. SIPIORA:  Good morning, your Honor.  David Sipiora, with me is Jeff Connor, from the firm of Kilpatrick and Townsend.  We represent the plaintiff Avago Technologies.

THE COURT:  Thank you.

MR. LEE:  Good morning, your Honor.  My name is Michael Lee with the firm Alston and Bird.  We represent defendants ASUS.  And I'm here with my co-counsel Mike Newton and Derek Neilson.

THE COURT:  All right.  Thank you.  Good morning.

So we have both the motion for reconsideration and motion to dismiss.  Motion for reconsideration in Avago 1 and to dismiss in Avago 2 to deal with.

Let me first address the reconsideration question.  Now, I had issued a ruling limiting reconsideration to the 15 products that evidently were clearly not offered for sale or sold until after service of the infringement contentions, and to me it's not -- frankly, I don't see a big deal as to whether or not -- why that shouldn't be reconsidered and allow it into the Avago 1 case.  There is time to deal with that.  It's 15 products.

The bigger question, it seems to me, is what do we do with respect to, you know, the other claims here, six hundred and, I guess, eighty or so products that are involved.

I will say that, you know, to the extent there is an argument that there's law of the case or a collateral attack upon the Court's ruling, I did not make or intend to make any kind of definitive ruling one way or the other about what would happen with respect to the second case, if one were brought and I were to deny, as I did, the motion to -- or request to amend the infringement contentions.

I did indicate my expectation was that that would be brought as a separate case, but nobody raised and we didn't get to the question about what would happen if that second case were brought.  It was obvious there might be limitations period issues and some loss of claim in terms of timing.  But nobody sort of raised the question, well, if a second case were brought, that would be impermissible claim splitting and, therefore, would have substantial consequences.

And I will say that since that wasn't brought up, I didn't rule on that and, frankly, that wasn't on my mind at the time. I mean, I didn't think through to the second, third sort of layer of consequence that might ensue.

Having said that, I mean, there -- and having recognized that I've already ruled that the motion for reconsideration is limited to the 15 at this point, and my finding of lack of

diligence, frankly, still holds, even though now there is some evidence that suggests had that diligence been exercised, perhaps it would have been made clear that the date for sale or offering for sale in the U.S., or if it was offered for sale in the U.S., any particular product, might not have been readily ascertainable for many of the products, or as readily ascertainable, but I did find that there was a lack of diligence which was sufficient.

On the other hand, as the Court in the *Fujitsu versus Tellabs Operations* case indicated that perhaps the Court may have -- would have evaluated the motion for leave to amend differently had it been clear that the defendant was going to ask the Court to forever bar; not just use the statute of limitations or an accrual date, a different accrual date, but to assert a complete bar because then the consequences are a bit different. It's not just a logistical question of having a separate vehicle to bring sort of new products -- claims as to new products or accused products. It's not just a question of a limitations period, but a complete bar.

So I say that as a general backdrop and that -- maybe that should not color the Court's view of the ultimate question if I were to deny -- to continue to deny reconsideration and keep the case separate, except for the 15 products, whether there ought to be -- whether there is, in fact, a claim splitting problem here.

And my take on the claim splitting issue here is that ASUS would have -- has the burden, the defendant is in the best position to assess whether or not the -- we're dealing with reasonably similar products, which is essentially the test that I would have to look at.  And, of course, having taken the position in the last case that -- that the plaintiff had failed to prove that they were reasonably similar and now taking the position that, well, they are reasonably similar, you know, I guess everybody sort of switched positions now to a certain extent, which is not terribly surprising, but ASUS would have the burden of showing that the original and the new products are essentially the same and based on a 12(b)(6) showing and its own words in the earlier case, I don't see how that finding could be made.

So, I'm not inclined if -- if reconsideration continues to be denied except with respect to the 15 and we proceed the way we are, at this juncture I'm going to deny the 12(b)(6) motion based on claim splitting.

Now, whether that leaves the door open when we have further development of the record, an explanation of these products and we get into it, I guess that's something we'll have to talk about, but I wanted to get your reaction.

I mean, frankly, I'm of two views of this thing.  One is that maybe reconsideration -- maybe I should reconsider my because of the consequences now that have been now brought to

the fore with respect to the motion to dismiss on the claim splitting issue adds greater weight.

As I say, it's not -- it wasn't just a logistical question.  And I had the discretion to say, well, notwithstanding a lack of diligence, there was no prejudice, et cetera, et cetera.  I never reached the prejudice prong, as some Courts have, because I found that the lack of diligence was sufficient to deny the request to amend the infringement contentions.

But with this consequence, you know, and one of the factors being what is a consequence of denying reconsideration or denying a motion to amend, as well as, you know, lack of diligence and everything else, should -- should I view that differently?  And if I don't, where do we go from here?

I'm denying the 12(b)(6) motion on claim splitting.  Does that leave the door open for further motion work as the record is developed, like a Rule 56 motion?  What happens at this point?

So you can go ahead since your motion for reconsideration was the first order of business here.

MR. SIPIORA:  Thank you, your Honor.

I think that the comments you made, I think, are apropos. I think it's important to consider the context.

What it goes back to originally, what this is about, is whether or not preliminary infringement contentions were

modified or amended in a timely fashion.  And the standard relates to whether or not there was undue delay or lack of diligence and whether there is prejudice.  That's the standard that we're operating under.

But importantly, if you recall going back, and this is -- you know, I think bears mentioning again.  We started in the Eastern District of Texas and under those rules we had an obligation to make certain type of allegations, yes, but also -- and the thing that we focused on in the reconsideration was the standard for amending in Texas is different than here in terms of whether or not there was diligence or not.  And the context also there is their standard also includes this issue of diligence and prejudice.

When the Court made the ruling on the reconsideration motion, it relied on, I think, a couple of cases in the Northern District that provided a basis to say even though the standard has diligence and prejudice, I can rely just on one and not look at the second.  And when we were in Texas, we had a standard that was different.

So that's point number one.  Under that standard if you look at prejudice, there really is none.  And we are operating under that basis.  We move very quickly.  I mean, the one thing is clear.  We move within two weeks.  And if you remember back July 31st --

THE COURT:  Two weeks of what?

**MR. SIPIORA:** July 31st is when we got their -- when we got their information and within two weeks of that we moved to compel in Texas, believing that was the proper course to do. We didn't move to amend the PICs, we moved to compel to get the information. And that motion was pending when this case was transferred.

So we weren't -- and even if you look at the total amount of time, it's a matter of a couple, three months total that there is any delay. So we moved very, very quickly, even within Texas rules, to do what we needed to do. Number one.

Number two. In the context of this case, if you look at prejudice in this case, this -- we made our motion to amend the PICs, we thought it was a belt and suspenders. We moved to compel again -- after we were transferred in October, we moved to compel again and we moved to amend the PICs knowing that the law here was tougher in terms of flexibility on PICs. We were very -- I think it was November 17th, within a couple of weeks or so of our transfer being granted. There was a bit of delay because the case didn't get assigned properly.

That was before there was even a case management conference. There's -- nothing had happened in the case in this docket. So when you look at it from the point of view of the cases that we're up against in terms of delay and impact, there is just absolutely no prejudice.

They had the information to us on the 650 products within

about a month, three weeks to a month of when it came up in Texas.  We knew they could get the information, and they were able to get the information, and they identified these products as reasonably similar.

So we knew they had the information.  We made the initial calculations.  I understand your view is we didn't -- we should have looked retrospectively, but we spent a lot of time to come up with the 200 products.  We made a decision.  Boy, they could easily find the rest on anything that was in the past.

Now, I understand you think that wasn't enough, but under the circumstances, under the circumstances then they were able to find the information very quickly, within three weeks, and then we moved quickly.

So in terms of prejudice -- and if you roll forward to this case, what is the prejudice to the other side?

**THE COURT:**  Let me ask you, is the consequence of the failure or the refusal to allow amendment of PICs a factor?  Not just a prejudice to the non-moving party, I understand that.  Lack of or presence of prejudice to the non-moving party.

But the consequences to the moving party, is that a factor that this Court is supposed to consider with respect to a request to amend?

**MR. SIPIORA:**  I think it says prejudice.  I don't know that it specifies either way.  As I'm standing here now, I

don't have the case in front of me, but it says prejudice.  And typically the prejudice is considered in the other direction, but I think it's appropriate to consider prejudice the other way.

What we're talking about is basically three X.  We're talking about X -- you know, basically a quarter of the case is alive in this part and three X more is left out.

And, again, this is -- the case has just started.  We're just off the ground.  We're doing claim construction now, but there is absolutely no prejudice --

THE COURT:  How would claim construction be affected were 695 products -- is it your position that there would be no difference in terms of claim construction?

MR. SIPIORA:  I suspect -- so if you left it this way, you've ruled the second case goes forward on, we'll say, 680, subtract the 15.  All right.  So we have the first case, 200 plus about 15.  So 215 goes forward.  We have the tutorial this afternoon.

All right.  The second case has 680 products at this point.  That would roll forward as well.

I'm not exactly sure what they're going to say on this, but as far as we know, they are telling us these products are substantially similar.  That's why they produced the information, at least for the 650.  And on that basis I would suspect that we don't even need to do a *Markman* in the second

indication.

THE COURT:  Well, then let me ask you, since you're in a better position to know these products.

Your argument now on claim splitting is they are substantially similar, although I find that that's something that can't be determined on a 12(b)(6).  We would need to get into it.  But tell me what you know about these 680.  Are they so substantially similar that we wouldn't need to do a second *Markman* hearing?

MR. LEE:  Your Honor, so to clarify on that point, on the claim splitting argument, the reason why we made the distinction in the first place is with respect to their infringement theories, as broad and conclusory as they are. And I would -- that's ASUS's position.  And that's the reason why we could not concede that they are reasonably similar.

And that's very different from us saying that they are materially different.  Because for claim splitting purposes --

THE COURT:  But you're in the best position to know.

MR. LEE:  Sure.

THE COURT:  Besides mincing words about whether you made an admission or simply said they didn't make their showing, I want to know, as we sit here, what do you know about these 680 products and is it your prediction that either I -- I allow the amendment and put them into Avago 1, or I leave them in Avago 2, or I consolidate the two cases and do some kind of

bifurcation, or just leave them separate.

Whatever it is, if we get to the point where we actually look at the merits of the infringement arguments on the 680 products, is there going to be any difference in terms of claim construction?  Are they so reasonably similar that we won't need to construe anything more?

MR. LEE:  Your Honor, it's difficult to say right now, but I think it's safe to say that the 650-plus products that are accused in the second case are essentially the same as the 200-plus group of products that they have accused in the first case.

I do have some additional exhibits that I could offer to the Court if -- if the Court would like.

THE COURT:  These are exhibits about the products themselves, or what are they?

MR. LEE:  Yes, about the products themselves.

THE COURT:  To illustrate how similar they are?

MR. LEE:  Yes, your Honor.

THE COURT:  Well, I will entertain.  Show me one that you think is a good example.

(Whereupon, document was tendered to the Court.)

MR. LEE:  So, your Honor, if you can turn with me to Exhibit 3.

THE COURT:  Okay.

MR. LEE:  This is the 1015E product.  It's one of the

first in the list of the additional products that Avago added in their proposed amendment PICs.

And just for the purposes of -- for this case they accused this product of infringing the '830 patent and the '148 patent. And if you look here, you can see that the processor is an Intel Celeron Processor.  Uses Windows 8.  Has an Intel Chipset.  And then down in the networking field it says Integrated 802.11 b/g/n, wi-fi module.  In the Audio portion it has Built-in Speaker, Digital Array Microphone, and an ASUS SonicMaster Lite Technology.

And then if you turn with me to Exhibit 4, this is the product specification for the ASUSPro Advanced B23E bearing the Bates label number ASUS-3375.  This is the first product on the list of the 200-plus products that are already in the first case, your Honor.

And if we just look here, it has an Intel Core Processor. Windows 7 operating system.  An Intel Chipset.  In the Networking field it has an Integrated 802.11 b/g/n.  Built-in Speakers and Microphone in the Audio field --

THE COURT:  Are you saying that this is substantially similar to the 1015E?

MR. LEE:  Yes, your Honor.  So the perspective that the Court needs to frame this in is that "essentially the same" means that any differences are merely colorable or not related to the infringement of the claims of the patent.  And,

actually, on this point if you can turn with me to Exhibit 1.

If you look at Exhibit 1, this is -- the Avago's claim chart for the '830 patent, and there is just one of these claim charts, and they have only addressed one particular product, and this is something we'll get into later when we address the *Iqbal/Twombley* issue, if at all, that the -- the way that Avago charts this infringement theory is in a very conclusory way. It merely recites the claim language and concludes that the product contains it. And there is nothing in this claim chart, their infringement theory, that would distinguish between the 1015E products and the B23E product.

**THE COURT:** Well, except you're saying this is too conclusory. This is inadequate. So if they did an adequate one, would you still have a lack of differentiation?

I mean, you're saying this is not a good marker stick because it's a crummy ruler. If we had a good ruler, what would the result be?

**MR. LEE:** Your Honor, again, that's very difficult to say because all we are working on is Avago's infringement theory at this point. And for full disclosure we are -- the parties are working towards -- hopefully working towards better PICs, better claim charts, but until then, this is -- this is what we have to work on, your Honor.

**THE COURT:** This is why I -- I have concluded that on a 12(b)(6) motion, I can't reach a conclusion that -- that the

products -- the old products and the new products are so essentially similar that claim splitting would apply.  I don't know that yet at this point.

What I'm trying to figure out is how we chart the course of this, and that is -- at some point I will know that and it may become clearer once you have better infringement contentions.  It may become clearer once we get to claim construction, as things develop.

Like I said, one test is going to be, you know, do we need other claim construction?  If they are so similar that you don't, I mean, if you don't need -- that suggests they are quite similar, but if -- if we didn't have to -- if we have to go through a whole new set of claim construction because there are different issues involved, that suggest that may not.  That's one factor to look at.

MR. LEE:  Well, your Honor, if I might just input something.  That for claim construction purposes, I don't -- I don't think there is really any reason to distinguish these new products because you know what -- what ASUS relies on is intrinsic evidence when we're going to argue what the claims mean and we wouldn't need any additional claim construction for purposes of these additional products.

THE COURT:  Well, here is the paradox.  If it ends up -- as we move things along and we hit greater clarity and specificity in this case, if it becomes apparent at some point

that these 680 products are essentially the same, we don't need -- I mean, the functions are the same, the circuitry, whatever it is, the algorithms and everything else are the same such that you don't need much evidence to prove the case against any one of those that's different from the other 200, that suggests claim splitting would be a problem, but that may also suggest maybe I ought to reconsider, you know, what's -- maybe I ought to reconsider the original motion in Avago 1?

I mean, there's a bit of a paradox here. The more essentially identical they are, the more one could say, well, does it really make sense to exclude these from the first case when they're -- they had no burden in terms of scope, in terms of the infringement analysis, in terms of claim construction. And the consequences of claim splitting are so consequential and -- and there is no prejudice at that point.

On the other hand, if there are some differences, that means it's not claim splitting. They shouldn't be brought into the first case and we should proceed along these lines.

I mean, there is an argument that one way or the other, these cases -- these products may see the light of day at least on the claim splitting amendment question. That is one argument.

There's also an argument that, hey, I found lack of diligence, notwithstanding what you've uncovered here, that had you exercised that diligence, maybe some of the information

wouldn't have been so clear. Because when you look at the URLs -- but that still doesn't gainsay the fact that I found there wasn't adequate diligence to start with, which I have the discretion to so find, and I did find.

MR. SIPIORA: You do. You do.

THE COURT: But, you know, so you could go either way.

I guess what I'm saying at this point, however I rule on this thing -- and I've already indicated my that ruling, that I'm going to grant reconsideration of the 15. I'm at this point not going to grant reconsideration of the 680. I'm going to deny the motion to dismiss on the claim splitting theory.

But that doesn't preclude a second round of this; that in one way you can't have your cake and eat it, too. You know, you can't say, well, the claim splitting applies because these are essentially identical products. We don't have to do anything different. That may open the door for a second reconsideration. That's all I'm indicating at this point.

MR. SIPIORA: Well, your Honor, thank you for that. I guess I would just ask the Court in the context of all of this what we're talking about are rules that are designed to give disclosure. Preliminary infringement contention, that's what this all started from. And in the context that we're talking about, I would submit that prejudice needs to be factored into the calculus.

Accepting what you said -- I'm not arguing back against what you just said.  You know, we put in the evidence that 85 percent of the stuff they identified doesn't show U.S. sales.  Notwithstanding that, you've seen that.

The question has to be whether or not the alleged failure to have amended the PICs or to have included in the PICs backward-looking activity caused any prejudice to the other side.  And in the circumstance where within a couple three weeks they gave us the information, we immediately moved forward, there really is no prejudice.  And there's significant prejudice on the other side.

At the end of the day, these cases do match up.  And I can't tell you for sure, they know better than I do, what the match-up is in the backs of these products.  But there probably is not going to be any need for additional claim construction.  We just heard it.  The discovery is going side-by-side.

It just makes a lot of sense for these things all to be under one roof.  It's under one judge.  We've got plenty of time in the schedule to get this done.  We have 40 subpoenas out to third parties now to gather information on components.  We'll have some more to do with respect to the additional products, but all this can be done under the existing schedule if we had these in the case.

So just makes a lot of sense, from our point of view, to be able to do that rather than have them separate.

Now, we can do them separate.  We'll lose -- we'll lose some products by your ruling, if you stand by this ruling and don't reconsider.  The statute of limitations does come into play, and our filing date six years back would be different.  So if you stayed with the ruling as it is, there would be, you know, significant impact to us in terms of backward-looking damages.

**THE COURT:**  Impact, but not a total wipeout.

**MR. SIPIORA:**  But not a total wipeout.  Not what we're talking about if you were to deny.  You already indicated you're going to deny the motion to dismiss.

But I would urge the Court to consider from the point of view of the prejudice standard.  There is a reason why there is two parts to the standard.  That's why Texas does it, they have a six-part test on the PICs issue.

Under the circumstances --

**THE COURT:**  Yet, you've made it clear in this district under our rules that prejudice is not essential.

**MR. SIPIORA:**  There are some cases.  There are some cases that say that.

I mean, I think you can argue either way.  There are cases -- if you look at Judge Hamilton's decision in the case that we see here -- I don't know if it's exactly the same, but the case that we cited in our brief under the circumstances, the *Jumpsport* case.

I mean, you have to look at the totality of circumstances. And here, when it's so early in the case, when the -- you know, we have been up against these guys for a long time. We have been in the trenches with each other. We've exchanged discovery.

The things that we are doing -- and to -- I mean, to their credit, and I think to our credit, we've had a good working relationship. We get information back and forth, generally speaking, and we've moved things along. That's reflected in the fact that within three weeks to four weeks they gave us the 650 products, identification information and so forth. They didn't give us full discovery on it, but they were able to identify reasonably similar products. They know what we're talking about. I mean, they know what we're alleging. This isn't like we're hiding the ball. They can read it.

**THE COURT:** Let me ask Mr. Lee. Now that we've the two cases, and at least at this juncture there is not argument based on claim splitting. I understand you have an invalidity argument, but that's separate.

What is the prejudice of having these products folded in to Avago 1 instead of maintaining two different lawsuits?

**MR. LEE:** Sure, your Honor.

So just -- it sounds like we're relitigating the motion to amend the PICs a little bit because, you know, the Court -- you ruled that there was a lack of diligence as far as not

satisfying the pre-suit investigation of publicly available information.  And the case law, at least in this district, says once you find that, there is no need to consider prejudice.

THE COURT:  No need, but you can.

MR. LEE:  You can.  That's definitely true, your Honor.

But I guess the prejudice, though, if the case -- if the products in the second case were folded into the first, is discovery closes in four months, your Honor.  And the current schedule just would not work for all products because right now we had -- just for the 200 products that were originally in the case, that took a significant amount of time, your Honor.  It took months of not only the client gathering all this information from various sources within the company, but also attorney time to provide the chart of accused components that -- that Avago had us do.  And so for 650-plus products that would take exorbitantly more time and the current schedule just wouldn't allow for that.

THE COURT:  And that would be true even if the 680 products are essentially the same?

MR. LEE:  Yes, your Honor, because we would have to verify that -- what components go into each of these products, all the sales information, all the technical information gathering.

I would imagine they might have to serve additional

third-party subpoenas if there are any differences in the components.

THE COURT:  What's your response to that?  It opens up a whole new wave of discovery --

MR. SIPIORA:  There is going to be --

THE COURT:  -- that has to be completed in four months.

MR. SIPIORA:  Yes.  Number one, from our perspective, their job is going to be easier this time than last.  They know what to look for and they know where to look.

So in terms of the attorney time and all that, we expect it to be less.  They will be able to move more quickly because they know what they are looking for.  They already identified these as substantially similar.

So I think from their perspective their job is going to be easier than it was for the first batch of 200.  Number one.

Number two.  Yes.  Depending on what they come up with, we'll have to do some additional third-party discovery.  It's very possible.  I don't know what their chip supplier arrangement is with respect because we've never had visibility. It is possible.  But we have four months.

Is it possible we'll need more time, both sides? Possibly.  But I -- I don't -- I don't know that right now and I know that we'll move very quickly.  And, certainly, the inter-party discovery that we need, there is going to be no

problem getting that done.

THE COURT:  What discovery is being undertaken now in Avago 2?

MR. SIPIORA:  Avago 2, nothing.  We just -- I think we just maybe served discovery, initial discovery at this point.  Just off the ground.

MR. LEE:  Your Honor, if I may add something?

THE COURT:  Yeah.

MR. LEE:  So one tangential, but very important issue in this discovery process is that there is an Intel license issue that we're dealing with.  It was alluded to in the briefing and it's definitely something that the parties are negotiating at this moment.

But for the 200-plus products, our understanding is that Avago's position on Intel -- on products that uses Intel components that satisfy the claims of the asserted patents are not accused.  And there are --

THE COURT:  Say that again?

MR. LEE:  Even among the 200-plus products, products that use Intel components, where the Intel components perform the asserted claims, are not -- are no longer accused.  And we're trying to work with plaintiff to get -- to remove those from the accused products list.

On top of that, the 650 products which are -- really, just many of them are just in the same product line, will use also

Intel products as well, your Honor.  And that is -- that is something that the parties are working, trying to get additional discovery on what -- you know, what the scope of the Intel license is.  There's just a lot of unresolved issues that are before the parties right now.

THE COURT:  All right.  Well, there are many ways that this can turn out.  At some point, you know, there could be just final denial of the claim splitting and we just go forward in the two trials.

There is a possibility that if we learn that the products are identical, for all intents and purposes, and that reconsideration should be warranted is a possibility of reconsidering, yet again, at some point and then bifurcating trial and try the first 200 cases or 215 products and then do a second phase.  And you can use the first one as a bellwether and it will tell you a lot of information about what's going to happen with the other 680 products, especially if they are essentially the same.

We don't necessarily have to try those in tandem or I could consolidate trial.  I could keep them separate.  Consolidate trial and do a -- there's, like, four or five different ways we can go on this.

My bottom line is what I've told you today, what I'm willing to reconsider today, my views on claim splitting as of this record right now.

But there is more that's going to be said about this.  And how it actually plays out may depend on how this goes.  It may be that we find that the products are not so substantially similar that we maintain two tracks, just like we normally would and, you know, proceed.

**MR. LEE:**  Your Honor, if I may -- if I might just address the issue of the collateral attack if claim splitting is not in the Court's favor at this time.

The collateral attack is still an issue at play, your Honor.  And I think one of the -- one of the concerns the Court has is the fairness to plaintiff.  And I -- in our reply brief we've made this clear; that the cases that allowed a second action for a plaintiff versus the ones that denied a second action, the very distinguishing, explicitly distinguishing item there is that the cases that allowed a second action was due to formal barriers or prejudice to the defendants, something where it wasn't on the fault of the plaintiff that those products were excluded from the first case.

**THE COURT:**  The whole point of barring collateral attacks is you can't -- if you have a definitive ruling on something, you can't attack it in another -- in another setting.  And I never made a definitive ruling.  All I determined was that these products are not going to be part of Avago 1.

So I -- I guess I don't even understand the collateral

attack argument.

**MR. LEE:** Your Honor, for example, if you -- one of the scenarios you said was to consolidate the two cases. If that happens, then these products that were excluded from the first case by the Court's order would be brought back in, effectively negating that order, your Honor.

**THE COURT:** Not necessarily. If we consolidate for trial, that just means for convenience we have one -- one jury determine -- you know, the start date would still be the same.

In other words, I can still say I'm not changing the infringement dates, the infringement contention dates and, therefore, the limitations period still applies as if there are two separate actions, but you could consolidate for purposes of trial, if these products are, you know, reasonably similar enough that it makes sense to have one trier of fact apply the same -- for economy purposes, for instance.

So that doesn't necessarily mean -- I see your point. If I were to -- well, if I were not to reconsider and, therefore -- if I reconsider, that's not a collateral attack. That's a direct attack.

If I were not to reconsider and hold that, your fear is if I then keep that structure but then consolidate somehow, that undermines my earlier ruling refusing the amendment.

**MR. LEE:** Yes, your Honor. And, really, I -- it's not even with the consolidation, just with the consolidation.

Even if there were two separate tracks, conceptually that's still going forward with the products that were excluded based on -- on plaintiff's dilatory conduct, your Honor.  And there is a --

THE COURT:  Well, but they would have paid a price, as indicated by -- because of their delay and lack of diligence, which I found, they've got to start the clock at a different point.  They have got to bring a new action.  They have lost time.  They may lose products.  But I don't see that as a collateral attack.

All I said is you can't have it in this case.  In fact, I said that I expect you to file a second case.  Of course, they are trying to say that's the law of the case and I'm saying I didn't make any definitive ruling.  I just indicated an expectation at that point.

So that's why I start at the outset saying I don't take the law of the case argument nor the collateral attack argument.  I don't find those -- either of those very persuasive.

So at this juncture I'm going to adhere to my basic determination about the lack of diligence.  And except for those 15 products, which we will now make part of Avago 1, I'm going to maintain this current structure.  I'm going to deny the motion based on claim splitting.  Because on this record there is -- there is no way that I can make that finding that

the products are essentially the same.

And, as I said, that -- perhaps that could come up with a better record at some point.  But if I were to reach that point, I'm just saying that all options are open.  That may open the door for reconsideration.

So, you know, everybody is going to take slightly inconsistent positions and everybody is going to accuse the other of trying to have their cake and eat it, too.  I'm watching that very carefully.  That's all I can tell you at this point.

MR. SIPIORA:  Just one point, so I don't want to not to have raised it.

On the -- on this claim splitting, there is a third prong requiring a final judgment on the merits.  And the law they cited says that you can infer that from the previous ruling, but they left out the part about the fact that -- and then determine if the second suit would be precluded.  We pointed that out in our opposition brief.

In other words, that final determination, quote/unquote, from this case, we would submit -- and "this" being Avago 1 -- was in the final determination on the merits that would work to preclude these other products from going forward.  In fact, the whole point is they weren't part of the case according to the previous ruling.

THE COURT:  Well, yes.  Although there is language in

some of the Ninth Circuit authority that you can apply claim splitting before final judgment on the merits because part of the idea is that you're not supposed to be able to maintain two actions simultaneously on the same subject matter at the same time.  So there is an interest here in -- in not allowing that.

**MR. SIPIORA:**  There is an interest, but if the determination is made that the products are not the same and they don't belong -- they weren't part of the case, which is what the premise is, they are not part of the case, then that first determination wouldn't have been final against the second products.

You have to be able to look back on the first ruling and say:  That's preclusion as to the second products on the merits.  And it wasn't a merits determination of those products.  Those products have never been evaluated in the merits.

So under the claim splitting doctrine, it goes to what your point was.  A total wipeout doesn't -- is not appropriate under the claim splitting doctrine.  Either they go in the first case or they go in the second case, but you can't say claim splitting precludes them all together because there wasn't a final determination as to those second set of products in the first case.  There couldn't have been.  There was -- they were not in the case.  That's the whole definition, why they are left to get in the second round.

**THE COURT:** Well, the prior litigation reaches a final judgment. Then you wouldn't disagree that claim splitting -- prospective claim splitting arises at that point, certainly.

**MR. SIPIORA:** It can't because these products are not part of the case. That's the whole point. You've ruled they are not in the case.

**THE COURT:** Well, but if they are essentially the same, then that's the whole point of the inquiry about whether or not it was really essentially the same claim.

**MR. SIPIORA:** Well, if you do that, though, you just eliminate the third prong. You don't even need a third prong. You just look at whether the products are the same.

That's the point. I think that there's a third prong there because you look to see whether or not there is a determination, final determination on the merits. That's -- because --

**THE COURT:** Well, you can have a final determination on the merits and coupled with the second prong, that these were essentially the same claims because the products are essentially the same. That's when claim splitting comes in.

**MR. SIPIORA:** Right. You need to have both. And what I'm saying is even if the products were the same, a separate and independent reason why claim splitting shouldn't apply is, as the record stands now with no reconsideration,

there could not be a final determination on the merits with respect to that second set of products in the first case. You've ruled them out.

THE COURT:  Except, you know, the Courts have distinguished between res judicata and claim splitting.

MR. SIPIORA:  Between?  I'm sorry.  Oh, res judicata, yes.  Yes.

THE COURT:  Res judicata.  Res judicata requires a final prior determination by judgment, or final judgment.

There is authority that says that claim splitting applies the same test as res judicata, which requires all three elements, as you noted, except traditional claim preclusion.

"Unlike traditional claim preclusion, the bar against claim splitting can be applied before either action reaches a final judgment."

That's the *Fujitsu* case that said that.

There is also a Tenth Circuit case that indicates that.

MR. SIPIORA:  That's a timing issue.  I agree with that language.  But it then goes on to say -- it says:

"What is required in the context of claim splitting is to assume that the first suit was final."

So you can assume that, even though it hasn't gone final. And this is a quote:

"...and then determine if the second suit could

be precluded."

So you're right.  The law says you don't have to wait for the final judgment.  You assume the final judgment, but you can't stop there.  You have to go see then at that point if it was final, whether there would have been preclusive effect --

THE COURT:  If it were final, would it have a preclusive effect?  And that turns on whether or not the same parties and privity and the same claims.  That doesn't -- that does not require -- there is a distinction between res judicata and claim splitting.

Maybe you and I have a different view.  That's my view of the law and that's what the Ninth Circuit said in *Adam versus California Department of Health Services*, that the purpose of the rule against claim splitting is not to allow somebody to maintain two actions at the same time involving the same defendant in the same court on the same claims.  You can't do that.

MR. SIPIORA:  Right.

THE COURT:  Right.

MR. SIPIORA:  And if the Court were to determine the -- at this point the Court determined the products are not in the case, Avago 1 does not have these products.

THE COURT:  I didn't determine that they weren't -- the question is:  Are they the same claim?  And the same claim question turns on whether or not they are essentially

identical, which we haven't resolved.

I know you're saying that you need an additional element of termination of the first one, and I'm saying that that may be true for res judicata.  That's not true for claim splitting.

In any event, let's talk briefly about *Iqbal*.  Well, you know, this was -- this is sort of a gray area at this point in terms of what needs to be pled at this point.  It does seem to me that the infringement contentions -- I think many of us in this district still are of the view that once you have infringement contentions, I won't say totally legally moots out the *Iqbal* question, but it seems to me that, you know, that's where the focus should be at this juncture.  It's certainly where we are in this case.

**MR. LEE:**  Well, your Honor, that still doesn't -- it still doesn't supplant plaintiff's duty to allege sufficient facts, plausible on their face, in their complaint; that there is a reasonable chance for them to, you know, find infringement.

And, your Honor, you're absolutely right.  This is a gray area, but I think that one thing that's pretty clear is that in this particular example -- and this is why we moved on the '830 patent specifically -- merely reciting the claim language should not suffice, your Honor.

And if you look at Exhibit 6 in that packet that I gave you, I've kind of color coded the side-by-side comparison of

Paragraph 75 in the complaint and Claim 1 of the '830 patent.

And, your Honor, having -- just taking those highlighted portions away for the purposes of the *Iqbal/Twombley* analysis, we're taking away or ignoring the conclusory portions and just looking at what's left and see if that -- if those allegations state a plausible claim on their face.

And all we have up at the very top is this very broad unlimited sentence that says:

"A processor and/or software capable of or adapted to decode digital audit datastreams, e.g., MPEG audio, et cetera."

So it's -- it is unbridled. It essentially accuses --

THE COURT: What would be sufficient in your view?

MR. LEE: It --

THE COURT: Take a specific product, product by product in the complaint, and identify the particular schematic or operations that it allegedly infringes?

What would be -- this is certainly more than your typical -- the old Form 18 that says: I've got a product that infringes, period.

MR. LEE: That's right, your Honor. But I think what the -- what it should be is at least provide facts that show that there is actual infringement going on. Something that is not so conclusory, not so accusing everything under the sun. Something that's concrete, that allows the judge or -- and the

defendants in this case to understand that there is a plausible claim of relief, your Honor.

THE COURT:  So what would satisfy that?  Tell me if you were the plaintiff, what would you put in here?

MR. LEE:  Yes, your Honor.  For example, I would -- I would have a very specific data form that's being accused, not this "e.g., MPEG audio," for example.

This is -- you know, this one single patent cannot reasonably be infringed by every single audio decoding technology out there.  And if that's the case, they certainly didn't provide facts to support that.

On top of that --

THE COURT:  Is it the "e.g." that's a problem?  You have would want them to list -- instead of "e.g.," "i.e."?  Like, every format or --

MR. LEE:  Well, I mean the "e.g." is just an example of digital audio datastreams, is what I imagined that they had in mind and they just didn't want to limit themselves to this MPEG audio.

But, your Honor, if that's all they have going on right now, that that's -- that should be what's in their complaint.

And on top of that --

THE COURT:  You're saying you have to list every single audio digital datastream that might be infringing besides MPEG?

**MR. LEE:**  That would certainly help in figuring out what is being accused.

**THE COURT:**  You think that needs to be done in a complaint even before infringement contentions are --

**MR. LEE:**  Your Honor, this doesn't provide us any notice.  And that's what *Iqbal/Twombley* stands for, this notice and facial plausibility.  We're not getting any of that from this --

**THE COURT:**  What I'm trying to figure out, so what -- you want them to exhaust and identify every -- every audio datastream at this juncture?

**MR. LEE:**  Your Honor, if plaintiff has done its homework, as it should have, as far as the patent local rules, then this -- they shouldn't have any trouble figuring out which specific data formats infringe their patent.

**THE COURT:**  They would argue you shouldn't have any problem figuring out which of your data formats:

"...synchronize a data processing unit to a
bitstream having synchronization codes successively
spaced by a predetermined interval with data for
processing disposed between the synchronization codes
where said bitstream has a data header comprising a
bitrate and sampling frequency."
You know your product.  You would know which of your products has that capability.

MR. LEE: Your Honor, the -- so the portion that you just cited was just part of the claim language and --

THE COURT: I know. But it's pretty specific and you say you have no notice. It's a little hard to believe that your client would have no notice, no idea which products might fall into this category.

And if they didn't, tell me what more -- what's the next step? What greater degree of specificity? You want them to list all the products then after this, or what?

MR. LEE: No, no. They actually did list the products, the 650 products that were excluded from the first case.

But the issue, your Honor, is that they are just harping back the claim language and we don't know what they mean by those -- what they mean by those claim limitations. And, you know, as exemplified by -- as exemplified by the fact that we are disputing claim terms here later this afternoon and the two weeks.

THE COURT: I don't -- well, that suggests you would never have to have a *Markman* hearing if the complaint is clear enough.

It is an iterative process and we do contemplate PICs as well as claim construction. And that suggests that degree of specificity escalates as you go along.

I understand you've got to have some degree of specificity

to start with, but it sounds like you're asking for almost the end game.

MR. LEE:  That's not true, your Honor.  We're definitely not looking for what would -- what would satisfy the local patent rules as far as the sufficiency of PICs.

What we're looking for in this particular complaint is, again, just having -- using the *Iqbal/Twombley* analysis, stripping away the conclusory portions and -- and seeing what's left, your Honor.  That those allegations state a claim, a plausible claim for relief, and that's -- it's just not happening with -- with an unlimited scope, digital audio datastream.

Which, your Honor, if you know, ASUS is a large computer and other electronic hardware manufacturer and seller and almost every product that ASUS sells can do MP3 audio or some type of audio and doesn't give us any way to limit the scope of this, this infringement breach.

THE COURT:  I'll give you a chance to respond briefly and I want to go on to the validity question.

MR. SIPIORA:  There is no case law that -- specifically identifying under the new law.  We've got -- obviously, the form is no longer acceptable.

But specific to what's required, we follow the Northern District cases, including the *Ultra Tech* case, and identified the six elements there.

This is somewhat ironic to say they don't have notice because we have three solid pages, single-spaced, according to this pleading 28 lines, that are just identifying products in this complaint.  And that list of three solid pages of products, hundreds of products, came from ASUS.  Those are among the 650 that they said under this patent were reasonably similar to that which we identified in ASUS 1.

So we know that they know how to calculate things because this is their list.  So under the circumstances to allege that they don't know what we're talking about, we chose language from the complaint.

As you can see, the language is pretty specific from the patent.  It makes sense to use that language.  But, most importantly, we gave them specific examples, three pages of them, of products they previously identified as reasonably similar.  Under the circumstances that more than meets any pleading requirement known to man.

MR. LEE:  Your Honor, just to correct that statement.  ASUS never said that these are reasonably similar with respect to the '830 patent.  Those products, we never identified them specifically for the '830 patent.  We just said that they are reasonably similar to the 200-plus products that are already accused.

THE COURT:  Let's talk about the Section 101 issue and the validity.

**MR. SIPIORA:**  On that, your Honor, Mr. Connor is going to argue that for us, so if I may just switch the podium?

**MR. LEE:**  And same for defendants.  My co-counsel Derek Neilson will argue that portion.

**MR. SIPIORA:**  Thank you, your Honor.

**MR. LEE:**  Thank you, your Honor.

**THE COURT:**  All right.  So I'm familiar with the two-step inquiry.  The first step is whether or not this is simply directed towards a patent ineligible concept in here, an abstract idea.

And, frankly, when one looks at the case law, it's really hard to discern exactly what a unified approach might be because it seems to me it's -- it all gets down to the level of specificity or generality that you choose to characterize the purpose of the patent or the claim.  And depending on how generalized it is, the more it looks like, you know, you're trying to implement an abstract idea and, therefore, not patentable and more specific it is, the more it looks like it's something much more than just an idea, wholly apart from the whole -- the novelty or inventive concept prong.

So I've seen the cases and, you know, I -- it's hard to discern when a Court is supposed to apply a more general versus more specific approach.  In this case you could say that the claim purpose here is to decompress digital video using a single memory; or you could say, more broadly, it's just to

decompress digital video and the use of a single memory is more on the how to part; or you can make it even broader saying, well, it's simply to decode data.

How is the Court supposed to make that determination for step one?

**MR. NEILSON:**  Your Honor, Derek Neilson for ASUS.

In this case I prepared some slides, if I may refer to them for this?  And I have a hard copy if --

**THE COURT:**  Okay.

(Whereupon, document was tendered to the Court.)

**MR. NEILSON:**  So I would turn first, just as a general principle going back to *Alice* slide four, one starting point to keep in mind that is that generic computer elements can't transform an abstract idea.

And similarly, you can't -- limiting the use of an abstract idea to a particular technological environment is also not sufficient.

So with that background, really, the foundational point for defendant's motion is on slide five, which is -- illustrates a section from the patent itself.  So the '087 patent puts together almost three whole columns explaining how MPEG is known, what is typically done in MPEG, what a typical MPEG decoder includes, and just the general components that are known and well used.  And so this sets forth the groundwork for -- the framework for what the patent is actually doing.

But on slide six, the first starting point for my analysis would be to turn to Claim 10, which is one of three independent claims in the patent and, also, the only independent method claim.

And so I've highlighted four different portions of this claim and I grouped this into the first part of the claim.

The first part of the claim is just doing exactly what the patent's MPEG background talked about. Here is how MPEG works. You receive an encoded stream. You demultiplex from the stream. You MPEG decode and you do control operations.

And the MPEG background has already told us that all of that existed. That all of that is known. And those are the -- that's the first part of Claim 10.

If we turn to the next slide, slide seven, shown in red is the real purpose of the claim. All of these limitations relate to the same thing.

Doing part one, which is traditional known MPEG decoding -- and this time do it with one memory. So on the preamble it refers to it as a single memory for use by the three different functions.

And then when it gets into the demultiplexing, it says the demultiplexing is done using the first unified memory. The MPEG decoding is done using the first unified memory. The control operations are done using the first unified memory.

And the last element shown here in red is really just

reiterating that each of those three operate using the first unified memory.

So the notion of -- the purpose of this claim is to take what is known and do it on one memory.  It is the foundational -- really, the idea behind this whole patent.

And I can flip through -- I'll just --

THE COURT:  That sounds more like lack of inventiveness than simply a manifestation of an abstract idea.

MR. NEILSON:  Well, your Honor, the abstract idea is -- is take what was known and do it on -- whether or not it's obvious over a system that uses two unified memories, it is -- it is not the question at this step.  It's really what is -- what is the purpose?  What is the purpose of this claim? And the purpose is to perform this MPEG decoding using a single memory.

THE COURT:  Right.  And that's -- that's sort of, I think, the narrowest characterization, which takes it out of, to me, the abstract idea function.

I'm not sure how -- you know, it's not just taking an idea and saying:  Well, here is a basic law of economics and we're going to apply this, or the way that you, you know, settle claims, et cetera, et cetera.

Why is this any more abstract than any other refinement of some known technology, but you do some improvement?

MR. NEILSON:  Well, your Honor, because -- excuse me.

THE COURT: Why is that abstract? Everything can be an abstract idea in that sense.

MR. NEILSON: That's true, your Honor.

The abstractness here is that there is no real improvement claimed. So let me advance to slide 12. And this is, again, looking at the same thing, but with -- but with portions of the specification called out.

And this is going back to the MPEG background where it says, you know, in the prior art the MPEG decoder would have one memory. In the -- and the system controller and the transport function, that would have a separate memory.

So what we're going to do -- in the prior art you couldn't use separate memories. So what we're going to do is use a single memory. That's our idea.

But if you look at the claim language, there is nothing in there besides use one memory. It's not claiming a special configuration that enables it to use one memory, where in the prior art, you know, there was some sort of technological -- something was preventing you from using one memory.

Here, it's just the bare notion of use one memory. If it was a claim where it was inventing a new memory which had special characteristics that could process MPEG decoding in a certain way and could address the transport logic in a certain way and there was something unique about this memory that enabled this to happen, then you would be drifting outside of

the abstractness.

Here, the claims are -- literally use one memory.  It's just the notion.

And that is reinforced on the next slide, slide 13.  This just discusses certain positions that Avago and its predecessor LSI have taken.  There was an ITC action between LSI and Funai and in that action Funai tried to say:  Well, there must be something special about this memory.  You know, if this meets anything, maybe it has to be a certain size.  It has to be smaller than prior art designs.  And then LSI came back and said:  No, no, no.  There is nothing special about this memory.  It doesn't even have to be a single memory.  It can be a memory that functions as a unit.

And then in this case, even though there are no '087 terms in our top 10 list for construction, they are maintaining the same position, that it's not a special memory that's doing this.  It's a memory functioning as a unit.

And so the abstractness comes from the idea that there is nothing unique about this memory that's enabling this invention to work.  It's just the idea, use one memory.

THE COURT:  So it's a lack of specificity to any limitations or characteristic of this memory.  It's just a general concept of using a single memory.

MR. NEILSON:  Yes, your Honor.  And, you know, whether that's expressed in terms of the memory or in terms of

how the known elements were -- would use it.  I mean, there were probably different versions of this where you could get out of the abstract realm.  But their claim is just -- you know, on its face used one memory, however you do it.

**THE COURT:**  And that's a 101 problem as opposed to enablement or vagueness or some other issue?

**MR. NEILSON:**  Yes.  It's definitely a 101 argument. It could --

**THE COURT:**  What's your best case for the proposition that you look not to the idea, but the specifics of the claim language to determine that it is so general, that without further directives in terms of how it is implemented or characteristics or limitations, that that makes it a 101 abstract idea problem?  Is there -- what's your strongest case for that proposition?

**MR. NEILSON:**  Well, so, again, the 101 case law is difficult because it is very broad at this point.

So starting with *Alice*, it's just a high level.  But if you even drill down to say -- there was a *Morales* case out of the Western District of Texas that emphasized that you're looking at the purpose of the claim; that when you go to this -- when you're trying to find out what the idea is, if it's abstract, what is the claim trying to do?

And here just the most direct way to get at that question is:  What is it trying to do?  And if you look at the -- it's

trying to say:  Take what is known and instead of using multiple memories, use one however you're going to do it.

MR. SIPIORA:  Your Honor, that's not a fair characterization of the patent at all.  The -- the claims don't say just use one memory.  They have very detailed limitations about the structure and function and operation of the video decoder system.

You know, Claim 1 says that:

"The transport logic accesses memory to store and retrieve data during demultiplexing."

It says:

"The system controller accesses the memory to retrieve coding data during system control."

It's not saying just use a single memory.  That's not the claim at all.

And, in fact, their whole motion here is predicated --

THE COURT:  What's new about this invention, though, is not the fact that you're accessing a memory, each of these components is accessing a memory to perform a function.  It's accessing a single unified memory, right?

MR. SIPIORA:  That's a part of it.  But it's accessing the single unified memory, according to the specific details that are provided in the claim.  It's not just saying you have a video decoder system that has system control transport logic, decoding and a unified memory.

It's saying you have those things and it's configured in a specific way to achieve this particular result.

And in any event, I mean, this whole notion that the video decoder system is some sort of general computing component is also false.  You know, if you look at their slide five, I think it was, where they call out the MPEG background, they are relying on this language to somehow impute the notion that the '087 patent admits that the video decoding system is a generic computer element, but that's not what it says at all.

It says an MPEG decoder system typically --

(Court reporter interruption.)

**MR. SIPIORA:**  I'm sorry.

The claim says that an MPEG decoder system typically includes something or generally includes something, but characterizing the video decoder system in that way is not tantamount to admitting that it's generic.

I mean, I could say that a Stradivarius violin is generally made from maple wood harvested from the forests of Croatia and typically includes a wood preservative having specific features, but that doesn't mean that the Stradivarius violin is conventional and it doesn't mean that the individual elements are conventional.

They're just saying that video decoding systems generally have these types of elements, not that they're generic computing components or that they're even conventional.  And

it's -- the '087 patent itself doesn't say anything about that.

And so when you look at a fair reading of the patent, you have a -- an improvement, which Section 35 U.S.C. 101 allows. It allows an improvement patent.  The preamble to the claims tell you exactly what the claim is about.  It's an MPEG decoder system with a single memory for use by transport, decode and system controller functions.  I mean, it's just plainly not directed to an abstract idea.  This is not hedging on a computer.

If their level of abstraction is allowed, then, as you mentioned earlier, everything is invalid under 101 and the exception to the rule becomes the rule.

**THE COURT:**  Well, what about his argument that it's abstract because just simply referencing the unified memory and sort of how it operates without much more description keeps it in the abstract realm.

**MR. SIPIORA:**  But it doesn't.  I mean, the case law is clear that you're not supposed to -- at least step one of the *Alice* analysis, you're not supposed to just reach in and see if you can distill an abstract idea.  You do a quick look to see what this is about.

And, in fact, when you recited what the claims are directed to, never did you get to the level of abstraction that they have in their motion.  Never did you say:  This is unifying multiple memories into a single memory.

It's a configuration of a video decoder system, something that you could hold in your hand and look at in a way that had never been done before.  And this is exactly what the patent laws are intended to protect.

And that's part of the reason why the statute itself explicitly allows for improvement patents.  And improvement patents build -- necessarily build on what was known before.

And the case law is clear that, you know, you can configure even conventional components, which these aren't, in an unconventional way to get a claim.  And that still falls within the ambit of what the patent laws are intended to protect.

**THE COURT:**  All right.  Your response?

**MR. NEILSON:**  Well, I would say -- first, I would go back to -- you know, he's focusing on its inventive because of all this stuff that was known.  It's not abstract because you can hold a video decoder.  Avago came up with an improvement, which was to use one.

If you wanted to put this in characterizations of a principal, like hedging, Moore's law is a -- kind of an observation by one of the founders of Intel that said, you know, every so many years the number of transistors in a circuit will double because technology improves and you can fit more things in there.  And that's not due to anyone's improvement along the way.  It's just because technology

improves, things get better.

The patent is getting to the same point.  It's saying, hey, prior art systems used two or three memories.  What we're going to do is use one.

And it's entirely abstract -- all the things he's pointed to, even the preamble, it's -- it says straight out that, you know:

"...which includes a single memory for use by transport decode and system controller functions."

So it's holding that up as the idea of the patent, but it's abstract because there is nothing grounding it in an actual improvement.

MR. SIPIORA:  Your Honor, just for point of reference.  Moore's law is not an abstract idea or a natural phenomenon.  It's an observation about how technology may improve over time.  And, in fact, today Moore's law is failing because technological advances have reached the point that actual laws of nature are impeding technological advancement.

THE COURT:  Well, I don't see this as a step one *Alice* analysis.  It seems to me that if you call this abstract, which is a specific way to improve an existing technology with a very specified component, it is true it may not explain all the -- with specificity exactly how it will operate.

It does talk about the function and how it interrelates to each of the steps in the decoding process, but it seems to me

that if you call this abstract, then any improvement on any existing process is automatically -- can be characterized as abstract. So I, frankly, don't buy that argument.

With respect to whether this is sufficiently inventive and whether this is novel enough, that turns on whether unification into a single memory was routine or a conventional engineering solution, that's something that is -- at this point, again, I don't see on a 12(b)(6) motion how I can resolve that.

So I'm going to deny the motion to dismiss and, obviously, without prejudice to further development in the case. It may come back as a Rule 56 motion or a trial or something else, but at this juncture -- I don't know if that's proper or not. I mean, 101 should be determined earlier on and whether that can be determined on a summary judgment motion, maybe.

Do you have a view on that?

**MR. SIPIORA:** I think if they are raising it now, they should be precluded from raising it again. I mean, They are saying the claim construction and all of that that doesn't impact it.

**THE COURT:** But evidence might. Novelty under step two and inventiveness may turn on, you know, how routine or conventional the engineering solution is. We don't have that evidence here and I can't really consider that very well on this record.

**MR. SIPIORA:** Right. And we'll get expert reports

and all that regarding novelty and non-obviousness as the case progresses.

But, you know, the law is clear that if you find that it's not directed to an abstract idea at step one, then you don't even need to look at the second step.

THE COURT:  Well, that's true.  I don't need to reach a second at this juncture.  I guess that is largely a legal question, not one that turns on facts.  Step one is -- if I rule in your favor, it sort of ends the analysis.

MR. SIPIORA:  Yes.

THE COURT:  Your comments to that.

MR. NEILSON:  Your Honor, it is a legal analysis, but we would, as discovery is ongoing -- I mean, we would definitely -- if there were something that was raised or we learned through discovery that would impact step one of the analysis, we would reserve our rights to raise them.

THE COURT:  All right.  Hard to imagine, but I can't foresee everything.  So as is shown earlier in this case, you never know what's around the corner.

So, anyway, I will get out a brief ruling on these matters to memorialize my determination, but essentially I'm denying the motion for reconsideration, in part.

Denying the motion to dismiss based on the *Iqbal/Twombley*, as well as the claim splitting argument, as well as on the 101 invalidity question.  But, again, reserving procedurally what

might happen as this case progresses.  So that adds some uncertainty to how we're going to proceed.

But I would -- we're going to proceed with Avago 1, as well this afternoon and in May.  And I think we have -- do we have a status conference or case management set in the second case?

**THE CLERK:**  May 9th at 1:00 p.m.

**MR. SIPIORA:**  Same day as the *Markman* hearing.

**THE COURT:**  And I'm going to ask the parties to look at an expedited discovery process, leaving open the possibility that there may be some adjustment.  Whether it's by way of consolidation for trial or whether I end up reconsidering, I want discovery in that case to move forward, and quickly.  And presumably because you have Avago 1, it won't be that difficult to find your way through and navigate discovery and case development in Avago 2.

Let me just ask you at this point.  I know we'll talk about this at the status conference, but -- and I forgot what we talked about last time, but in terms of potential A.D.R., are you engaged in any A.D.R. process at this juncture?

**MR. SIPIORA:**  We just submitted our statement on that.  I believe we indicated mediation was the option we were going to select.

The parties are talking right now.  I'm not engaged in that process, but I know the parties are talking and I believe

that down the road that mediation is likely the path we're going to take.

THE COURT:  Same for you?

MR. NEWTON:  We have mediated and -- with the mediator and some of the folks are talking.

THE COURT:  Okay.  All right.  I guess we can explore that at the status conference in this case.  Thank you.

(Proceedings adjourned.)

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Debra L. Pas*
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, April 28, 2016